Filed 8/19/21  P. v. Banales CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SALVADOR BANALES,<br><br>    Defendant and Appellant. | 2d Crim. No. B302221<br>(Super. Ct. No. 2018029370)<br>(Ventura County) |

Salvador Banales appeals a judgment following his conviction for committing a lewd act on a child under 14 years of age (Pen. Code,[1] § 288, subd. (a)) (counts 1-2, 4-6); and committing a lewd act on a 14- or 15-year-old child (§ 288, subd. (c)(1)) (counts 7-8).  The jury found Banales was subject to the enhanced punishment provision of section 667.61.  The court sentenced him to an aggregate prison term of 75 years to life, plus three years eight months.

_____

[1] All statutory references are to the Penal Code.

We conclude, among other things, that 1) the trial court did not abuse its discretion by denying a request for a continuance for Banales to attempt to find private counsel; 2) the court did not err by admitting Child Sexual Abuse Accommodation Syndrome (CSAAS) evidence; 3) Banales has not shown prosecutorial misconduct; 4) the court did not contravene Banales's constitutional rights when it imposed fines and fees; but 5) the court erred in imposing a fine and penalty assessments under section 290.3.  We strike the fine and penalty assessments under section 290.3.  In all other respects, we affirm.

FACTS

Child Victim 1 (CV1), a 13-year-old girl, testified that one night she was sleeping on a couch.  She was awakened by Banales who was kissing her on her mouth.  He put his tongue in her mouth, put his hand on her thigh near her "crotch," and licked her ear with his tongue.  A family member called the police.

A surveillance video camera in the home recorded this incident.  The police took a "clip of the incident" recorded on the surveillance video as evidence.

The police questioned Banales and he admitted kissing the child and placing his tongue in her mouth.  He said, "[S]he's kinda . . . attractive to me."

Child Victim 2 (CV2), now an adult, testified about events that occurred when she was a child.  She said when she was 9 or 10 years old, Banales unbuckled her pants and touched her vagina.  When she was either 8 or 10 years old, he unzipped his pants and put her hand on his penis.  Banales said she "was a whore like [her] mom" and "one day [she would] be on [her] knees for him."

2

CV2 testified Banales would stick out his tongue and make "sexualized statements." He touched her breast. She did not tell her mother about these events. Banales told her if she reported these events, he would have her mother arrested. CV2 was scared.

In another incident CV2 was sleeping on a couch. Banales came over and touched her breast. One time CV2 was wearing a Little Mermaid dress. Banales said he wanted to see if she was still a virgin. He stuck his fingers inside her vagina. During one incident when CV2 was riding in a truck with Banales, he pulled off the side of the road. He put his hand on her thigh and said, "[C]ome on, just this one time."

When CV2 was 15 years old doing homework, Banales came in completely naked. He opened the door and "threw himself on [her]." He was drunk. His tongue was on her neck. He licked her. CV2 testified, "I thought he was going to rape me." He tried to take her clothes off. When she was 14, Banales subjected her to "household love taps" where he would touch her breast or vagina.

Child Victim 3 (CV3), now an adult, testified about events that occurred when she was a child. She said Banales would ask her if she was a virgin. He said, "Let me check." Banales directed more of his attention to CV2. CV2 was the "weakest one." CV3 was afraid to disclose Banales's sexual abuse "because he was the provider in [her] family household. . . . He was the one with the job. He was the one paying the rent."

On CV3's 15th birthday, she woke up to Banales "kissing [her] and touching [her]." He put his tongue in her mouth. He touched her "inner thigh."

3

*Testimony on CSAAS*

Doctor Veronica Thomas, a clinical and forensic psychologist, testified about the components of CSAAS. She said Doctor Summit, who authored the CSAAS study, intended "it to dispel myths and misconceptions that the public may have regarding the way children or sexual abuse survivors respond and react to abuse."

Thomas said "secrecy" is a CSAAS component that recognizes that children experiencing sexual abuse "may know not to say anything to anybody for a variety of reasons or they may be told don't say anything to anybody. . . . There are a lot of reasons that . . . can be very terrifying for a child to consider saying anything to anyone." A number of factors that contribute to the delay by children in reporting sexual abuse include "shame," "self-doubt," "helplessness," the child's learned ability to cope with the sexual abuse, and a child's ignorance about whether the sexual abuse the child is experiencing is wrong.

Thomas testified children who are abused "get accustomed to [it]" and "it becomes part of their normal." "[T]hey put it out of their mind or they pretend to be asleep." That would be "one coping mechanism." Most disclosures about child sexual abuse "occur in adulthood." Some children who have reported abuse may recant the claim of abuse.

Thomas testified that she had not interviewed or met the victims or witnesses in this case. The trial court instructed jurors that Thomas's testimony on CSAAS "is not evidence that the defendant committed any of the crimes charged against him."

4

DISCUSSION

*Denying the Request for a Continuance*

Banales contends the trial court erred by denying a continuance to allow him "the opportunity to retain private counsel."

The People respond that the request for a continuance "was untimely and the court was within its discretion to deny it." We agree.

On September 4, 2019, before the start of trial, Banales requested a two- to three-month continuance so he could retain private counsel. Banales's appointed counsel was prepared to proceed to trial. The court denied the request.

"[T]he courts will make all *reasonable* efforts to insure that a defendant financially able to retain an attorney of his own choice can be represented by that attorney." (*People v. Johnson* (1970) 5 Cal.App.3d 851, 858.) The trial court has "broad discretion" to decide whether there is good cause for a continuance. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037.) A showing of good cause requires the defendant to act with due diligence. (*Ibid*.) Factors a court may consider in denying a request for continuance to substitute private counsel for appointed counsel include: 1) unjustified delay in asserting a "desire to retain private counsel," 2) making the request on the day of trial, and 3) "failure of the alleged private counsel to contact the court." (*Johnson*, at pp. 858-859.) The court may also consider the burden on witnesses scheduled to testify. (*Jenkins*, p. 1037.)

Here the prosecutor objected to the continuance, claiming 1) the case had been "assigned to a courtroom" for trial, 2) both sides had "announced ready," 3) Banales was represented by the

public defender, and 4) a continuance would cause undue hardship to the victim witnesses. Banales's appointed counsel told the court that he first learned that Banales wanted private counsel 5 to 10 "minutes ago."

The trial court asked Banales, "Have you spoken to any private defense attorneys?" Banales: "My son has. I haven't." The court asked when his son spoke to private counsel. Banales responded, "Over this Labor Day weekend." The court: "Does your son know your trial is commencing?" Banales: "No, sir." The court: "Have you retained any attorney?" Banales: "No. Sir."

The People note that although Banales was initially represented by private counsel, appointed counsel had represented him since March 2019 and this case had been continued multiple times. They note that on March 28 the case was continued to April 12. On April 12, it was continued to May 9. On May 20, it was continued to June 4. On May 29, it was continued to June 19. On June 18, it was continued to August 1. On August 1, it was continued to August 20. On August 20, it was continued to August 28. On August 28, it was continued to September 3. On September 3, all parties announced they were ready for trial.

Banales was "given numerous opportunities to hire an attorney of his own choice" during the numerous continuances granted in this case. (*People v. Blake* (1980) 105 Cal.App.3d 619, 624.) As the People note, Banales had not retained private counsel, had not spoken to private counsel, and he was not even able to provide the court with the name of any private attorney. He had only informed his appointed counsel about the private counsel issue *minutes before the hearing* started. No private

6

attorney had contacted the court to confirm any agreement to represent Banales. Banales's son was not in court. Nor did his son provide any information to the court. The prosecutor objected to the continuance on multiple grounds, including that a continuance would cause "undue hardship to the victims, two of whom are minors." These factors supported the court's decision to deny the continuance. (*People v. Johnson, supra*, 5 Cal.App.3d at pp. 858-859.)

In addition, this request was not supported by a declaration (§ 1050, subd. (b)) or any evidence. Consequently, there is no evidentiary support for the factual claims Banales asserted in the request for a continuance. The trial court was in the exclusive position to determine the credibility of his *unsworn* statements in court in support of his request. As Banales concedes, he had previously filed a *Marsden* motion (*People v. Marsden* (1970) 2 Cal.3d 118) that the trial court found to be without merit.

*Admission of CSAAS Evidence*

Banales contends the trial court erred in admitting expert testimony on CSAAS. He claims, "California courts should join the well-reasoned decisions of . . . sister jurisdictions and hold that CSAAS evidence is inadmissible for all purposes."

The People contend this evidence was properly admitted "to disabuse the jury of common misperceptions about child sexual abuse, in particular regarding why children delay reporting abuse." (Boldface omitted.) We agree.

Our Supreme Court has held that CSAAS evidence "is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident – e.g., a delay in reporting – is inconsistent with his or her testimony claiming molestation." (*People v. McAlpin* (1991) 53

Cal.3d 1289, 1300.) " 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*Id*. at p. 1301.) Such evidence "is not admissible to prove that the complaining witness has in fact been sexually abused." (*Id*. at p. 1300.) "The expert is not allowed to give an opinion on whether a witness is telling the truth . . . ." (*People v. Long* (2005) 126 Cal.App.4th 865, 871.)

Banales cites a small number of out-of-state courts that he argues reached a different result than *McAlpin*. We decline his invitation to reject *McAlpin*. Our Supreme Court decision is binding on all lower courts in this state. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Moreover, California is not alone in admitting this expert testimony. In *McAlpin*, the court said, " 'The great majority of courts approve such expert . . . testimony.' " (*People v. McAlpin*, *supra*, 53 Cal.3d at p. 1301.)

*McAlpin* was decided in 1991. Banales claims since then other jurisdictions have declined to follow *McApin*. He suggests this trend establishes that CSAAS is no longer a viable doctrine. But we rejected this claim in *People v. Munch* (2020) 52 Cal.App.5th 464, 470-472. We held that currently "the vast majority of jurisdictions . . . have rendered decisions that are consistent with *McAlpin*." (*Id*. at p. 472.)

The defense theory was that the People's witnesses were not credible and they did not immediately report the crime. Defense counsel told the jury, "So all of a sudden they are in their early to mid 20s and they come forward with these allegations." Counsel stressed one of the witnesses "didn't report anything to

law enforcement" at the time of the incident. But delay in reporting is not unusual for child sex abuse victims. This CSAAS evidence was important for the jury to consider why sexually abused children often delay in reporting the crime. (*People v. McAlpin*, *supra*, 53 Cal.3d at pp. 1300-1301.)

The trial court instructed jurors that Doctor Thomas's testimony on CSAAS "is not evidence that the defendant committed any of the crimes charged against him." Thomas testified that she had not interviewed or met the victims. No reasonable juror would conclude that her testimony constituted an opinion about the credibility of any particular witness in this case or on the issue of Banales's guilt or innocence. She merely explained the common behavior of sexually abused children. She testified about the reasons why they delay in reporting these crimes, including such factors as shame, self-doubt, helplessness, the child's ability to cope with the sexual abuse, and ignorance about whether the sexual conduct is wrong. Banales has not shown that the court erred by admitting evidence on CSAAS.

Moreover, Banales has not shown how the exclusion of this testimony would change the result. The People's case was strong. They note "the defense presented no evidence, and . . . the defense closing argument failed to identify any factual inconsistencies in [the witnesses' testimony]." The jury found the People's witnesses to be credible.

*Prosecutorial Misconduct*

In closing argument Banales contends the prosecutor committed misconduct by appealing to the "passions and prejudices of the jury."

In commenting on the evidence, the prosecutor told the jury to review a video in evidence showing "that a 68-year old man

9

would French kiss a 12-year-old as she slept." He said, "There is no innocent explanation for this behavior. *This is repulsive*." (Italics added.) Defense counsel objected. The objection was overruled.

Later the prosecutor said, "[P]redators in the quest for their predation will often single out and isolate the weakest among a family." Defense counsel objected.

The trial court overruled the objection. It said the comments "fell within the factual testimony" and did not cross "the line."

A prosecutor may not engage in " ' " 'a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " ' " (*People v. Hill* (1998) 17 Cal.4th 800, 819.) Nor may a prosecutor use deceptive or reprehensible methods to attempt to persuade the jury. (*Ibid*.)

Statements by the prosecutor to the jury must be considered in context. (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1030.) "Argument may be vigorous and may include opprobrious epithets reasonably warranted by the evidence." (*Ibid*.) In *Edelbacher*, the following strong language by the prosecutor did not cross the line into prosecutorial misconduct – "contract killer," "snake in the jungle," "slick," a "pathological liar," and "one of the greatest liars in the history of Fresno County." (*Ibid*.)

Here the term "repulsive" was not a reference to Banales per se, but to his *conduct*. The use of this term was an inference drawn to distinguish his lewd conduct shown by the evidence from claims by the defense that it was benign or non-sexual. It was a comment made in the discussion of the evidence in the record. (*People v. Edelbacher*, *supra*, 47 Cal.3d at p. 1030.) The

10

language about predators seeking out "the weakest among the family" was also supported by evidence in the record. One sister testified that Banales "predatored . . . on the weakest one out of all of us." She said that weaker one "was more of a victim." The prosecutor's comment was related to evidence in the record. Banales has not shown prosecutorial misconduct.

*Dueñas*

Banales notes the trial court imposed fines and fees, including a $3,000 fine under section 1202.4, and a $3,000 fine under section 288, subdivision (e). Citing *People v. Dueñas* (2019) 30 Cal.App.5th 1157, he claims all the fines and fees imposed must be vacated "because the court imposed them absent a determination of his present ability to pay."

The trial court found that imposing the fines would not violate the Eighth Amendment, the fines were "proportionate," and Banales "will have the opportunity in custody to work and earn money that could be used to pay his fines." In assessing the fines and fees, the court stated that it was relying on *People v. Aviles* (2019) 39 Cal.App.5th 1055.

In *Duenas*, the appellate court held that imposing fines on defendants who lack the ability to pay violates due process. (*People v. Dueñas, supra*, 30 Cal.App.5th at p. 1168.) Courts following *Dueñas* have held the defendant must have "the opportunity to request a hearing on his ability to pay . . . ." (*People v. Santos* (2019) 38 Cal.App.5th 923, 934-935, italics added.) Here Banales had that opportunity. His counsel claimed he did not have the ability to pay. But he did not request an evidentiary hearing on that issue.

The defendant is "obligated to create a record showing his inability to pay." (*People v. Aviles, supra*, 39 Cal.App.5th at

11

p. 1074.)  Because Banales is in the best position to know his own financial condition, he has the burden to present evidence at a hearing to show why a fine should not be imposed.  (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154.)  He has not met his burden.  Banales has not shown that the fines and fees are "grossly disproportional" when compared to the gravity of his felony offenses.  (*United States v. Bajakajian* (1998) 524 U.S. 321, 334; *Aviles*, at p. 1070.)

Nor has Banales shown why the trial court could not reasonably find ability to pay in installments.  Documentary evidence in the record shows Banales was receiving income.  Banales filed a financial declaration with the probation department showing current monthly retirement income of $2,800, which would amount to a yearly income of $33,600.  Banales has not shown why the court could not reasonably reject his claim that he lacked the ability to pay any fines or fees given that amount of income.

In addition, " ' "ability to pay does not necessarily require existing employment or cash on hand." ' " (*People v. Aviles*, *supra*, 39 cal.App.5th at p. 1076.)  The court may consider the defendant's ability to pay in the future.  (*Ibid*.)  This may include the defendant's "ability to earn prison wages." (*People v. Santos*, *supra*, 38 Cal.App.5th at p. 934.)  These fines may be paid in installments.

Banales claims he would not be able to earn prison wages.  The probation report reflects, among other things, that he told the probation department that he is 70 years of age, he has diabetes, suffers from high blood pressure, and takes medications.  But Banales made no evidentiary showing at the hearing about inability to pay from prison wages.  (*People v.*

12

*Aviles*, *supra*, 39 Cal.App.5th at p. 1076; *People v. Frye* (1994) 21 Cal.App.4th 1483, 1487.)  The probation report recommended that Banales be sentenced to prison and pay fines.  But it made no determination about his alleged inability to earn prison wages.  This is a matter Banales should have presented to the court with evidence under oath.

The trial court indicated that it was relying on *Aviles*, not *Duenas*.  But the record does not show that it would have refused a request to present evidence to preserve a record on appeal on Banales's ability to pay had counsel requested one.  Banales has not shown grounds to excuse his failure to request an evidentiary hearing and present evidence to preserve an adequate record. (*People v. Frandsen, supra*, 33 Cal.App.5th at p. 1154.)

*The Fine Under Section 290.3*

Banales and the People agree that the trial court erred by imposing a $2,000 fine plus penalty assessments under section 290.3.  The trial court said, "Pursuant to Penal Code section 290.3, he's ordered to pay a fine of $2,000, including penalties assessments."  There was no finding or indication as to what those penalty assessments were.

In view of this concession, we strike the $2,000 fine and penalty assessments under section 290.3.

DISPOSITION

We strike the $2,000 fine and penalty assessments under section 290.3.  In all other respects, we affirm the judgment.

NOT TO BE PUBLISHED.

GILBERT, P. J.

We concur:

YEGAN, J.          TANGEMAN, J.

13

Gilbert A. Romero, Judge

Superior Court County of Ventura

———————————————

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Idan Ivri, Deputy Attorneys General, for Plaintiff and Respondent.